399 S.E.2d 192

**KENNETH B. and Phyllis B.**

v.

**ELMER JIMMY S.; Wilma Jean S.; George Ryan S.; and Glen R. Rutledge, Guardian Ad Litem for George Ryan S.**

**No. 19569.**

Supreme Court of Appeals of West Virginia.

Nov. 13, 1990.

Donald R. Jarrell, Wayne, for Kenneth and Phyllis B.

Larry E. Thompson, Williamson, for E.J. and W.J.

Robert H. Carlton, Williamson, for G.R.S.

PER CURIAM:

After George Ryan S. was convicted of the murder of his wife, a dispute concerning the custody of their child arose among the grandparents.[1] The Circuit Court of Mingo County terminated the parental rights of George Ryan S. and awarded joint custody of the child to the maternal and paternal grandparents. Kenneth and Phyllis B. (the mother's parents) appealed to this Court alleging that they never agreed to joint custody. George Ryan S. also appealed the termination of his parental rights alleging that he never abused or neglected his son. Although we agree that George Ryan S.'s parental rights were correctly terminated, we find that joint custody of the child should not have been awarded and, therefore, we remand this case for an expedited hearing to determine the custody of the child.

On March 16, 1988, George Ryan S. (the child's father) was convicted of murder, in the second degree, of Eskaleen Marie S., his wife and mother of his child. George Ryan S. was sentenced to not less than 5 or more than 18 years in the state penitentiary. After his conviction, George Ryan S. nominated his parents, Elmer and Wilma S., to be primary guardians for his and his dead wife's infant child. The child, George Ryan S. II, had been born on March 21, 1986. After the mother's murder, Wilma S. (the father's mother) was the primary caretaker of the child from February 1987 through October 1988; even though George Ryan S. lived with his parents prior to his incarceration and conviction.

Kenneth and Phyllis B. (the mother's parents) sought grandparent visitation with the child and after a hearing on January 8, 1988, a family law master awarded them visitation. However, no visitation occurred until Kenneth and Phyllis B. brought contempt proceedings. Wilma S. (the father's mother) testified that the child's allergies had prevented some visits and she refused to allow any visitation outside her house. Kenneth and Phyllis B. were reluctant to visit their grandchild in the house of Elmer and Wilma S. (the father's parents). However, Kenneth B. testified that visitation improved after the contempt proceedings.

On September 8, 1988, Kenneth and Phyllis B. petitioned the circuit court for custody of the child and for termination of the father's parental rights. At a hearing on October 17, 1988, the circuit court terminated the father's parental rights and awarded custody of the child to Kenneth and Phyllis B. with visitation rights to Elmer and Wilma S.[2] The order was entered November 3, 1988.

Thereafter the circuit court judge, *sua sponte*, instructed the parties to work out a joint custody arrangement. Although Kenneth and Phyllis B. objected and refused to work toward a joint custody arrangement, shortly thereafter, Elmer and Wilma S. petitioned for joint custody. At a hearing on March 20, 1989, joint custody was awarded with physical custody rotating between the maternal and paternal grandparents on a month-to-month basis and visitation with that month's non-resident grandparents on alternating weekends. The joint custody order was entered on June 16, 1989.[3] On appeal Kenneth and Phyllis B. maintain that circuit court should not have awarded joint custody over their objection and that they should be awarded sole custody. Elmer and Wilma S. maintain that they, as

1. We adhere to our past practice in styling domestic and juvenile cases that involve sensitive facts and do not utilize the last names of the parties. *See David M. v. Margaret M.,* 182 W.Va. 57, 385 S.E.2d 912 (1989); *Nancy Viola R. v. Randolph W.,* 177 W.Va. 710, 356 S.E.2d 464 (1987).

2. Because of a remark made by Wilma S., the circuit court originally restricted Elmer and Wilma S.'s visitation to the house of Kenneth

and Phyllis B. However this restriction was modified because Wilma S., who had cared for the child for about one and one-half years, was reluctant to go to Kenneth and Phyllis B.'s house.

3. The circuit court hoped to encourage cooperation between the maternal and paternal grandparents with his modern day Solomon decision of figuratively dividing the child in half. (1 Kings 3:26)

primary caretakers of the child until October 1988, should be awarded custody or that joint custody, which they maintain has been working, should be continued. George Ryan S., the child's father, also appealed the termination of his parental rights.

### I

In its decision to terminate George Ryan S.'s parental rights, the circuit court took judicial notice of his conviction for the murder, in the second degree, of his wife. The court noted that Eskaleen S. had also been the victim of repeated acts of violence and abuse by her husband. Kenneth B. testified that he had seen signs of this abuse on his daughter. In addition, the court noted that after George Ryan S. had killed his wife, he placed her body in his car's trunk and drove her body to a remote area where, until dissuaded by a friend, he planned to bury her in an unmarked grave. The record also indicates that after Eskaleen S.'s murder when George Ryan S. returned to live in his parents' house, Wilma S., his mother, assumed primary care of the child.

█ The standard for judging parental fitness was recently reiterated in Syllabus Point 1, *Nancy Viola R. v. Randolph W.*, 177 W.Va. 710, 356 S.E.2d 464 (1987), which stated:

> "A parent has the natural right to the custody of his or her infant child, and, unless the parent is an unfit person because of misconduct, neglect, immorality, abandonment, or other dereliction of duty, or has waived such right, or by agreement or otherwise has permanently transferred, relinquished or surrendered such custody, the right of the parent to the custody of his or her infant child will be recognized and enforced by the courts." Syllabus, *State ex rel. Kiger v. Hancock*, 153 W.Va. 404, 168 S.E.2d [798] (1969). Syl. pt. 2, *Hammack v. Wise*, 158 W.Va. 343, 211 S.E.2d 118 (1975).

Syllabus Point 2, *Collins v. Collins*, 171 W.Va. 126, 297 S.E.2d 901 (1982); Syllabus Point 1, *Leach v. Bright*, 165 W.Va. 636, 270 S.E.2d 793 (1980); Syllabus, *Whiteman*

*v. Robinson*, 145 W.Va. 685, 116 S.E.2d 691 (1960).

*W.Va.Code*, 49-6-5(b) [1988] expressly includes among the "conditions of neglect or abuse," which constitute ground for termination of parental rights, the following:

> (5) The abusing parent or parents have repeatedly or seriously injured the child physically or emotionally, or have sexually abused or sexually exploited the child, and the degree of family stress and the potential for further abuse and neglect are so great as to preclude the use of resources to mitigate or resolve family problems or assist the abusing parent or parents in fulfilling their responsibilities to the child.

█ Recently we considered a similar case concerning the termination of a father's parental rights after the father's conviction for murder of the child's mother. In *Nancy Viola R., supra* 177 W.Va. at 714, 356 S.E.2d at 468, we noted that spousal abuse is a factor in determining parental fitness for child custody. *Collins, supra.* In this case as in *Nancy Viola R.*, "the most convincing evidence of the [father]'s unfitness is his conviction of the ... murder of his wife...." *Nancy Viola R. supra* 177 W.Va. at 714, 356 S.E.2d at 468. In Syllabus Point 2, *Nancy Viola R. supra*, we stated:

> A conviction of first degree murder of a child's mother by his father and the father's prolonged incarceration in a penal institution for that conviction are significant factors to be considered in ascertaining the father's fitness and in determining whether the father's parental rights should be terminated.

George Ryan S. argues that *Nancy Viola R.* is not dispositive in his case because he was convicted of murder in the second degree, and not first degree, and the record contains no evidence of child abuse. In *Nancy Viola R. supra*, 177 W.Va. at 715, 356 S.E.2d at 469, we found the reasoning of *In re Abdullah*, 85 Ill.2d 300, 53 Ill.Dec. 246, 423 N.E.2d 915 (1981), a factually similar case, to be particularly relevant. In *Abdullah*, the Supreme Court of Illinois listed three factors that justified termi-

nation of the father's parental rights: (1) the father was convicted of murder; (2) the child's mother was the murder victim; and (3) "the murder was accompanied by exceptionally brutal and heinous behavior demonstrating wanton cruelty." *Id.* 85 Ill.2d at 307, 53 Ill.Dec. at 249, 423 N.E.2d at 918.

■ Parental rights may be terminated only upon clear and convincing evidence. *W. Va. Code,* 49–6–2(c) [1984]; *Nancy Viola R., supra* 177 W.Va. at 715, 356 S.E.2d at 469; *State ex rel. West Virginia Department of Human Services v. Cheryl M.,* 177 W.Va. 688, 356 S.E.2d 181 (1987). In the present case, there is clear and convincing evidence to terminate George Ryan S.'s parental rights.[4] George Ryan S. had a history of abusing his wife, which culminated in her murder. The murder of a child's mother is "the ultimate act of savagery to that child" because of the emotional and psychological scarring of the child. *Nancy Viola R., supra* 177 W.Va. at 716, 356 S.E.2d at 470. We find the minor factual differences between this case and *Nancy Viola R.* to be without merit and therefore, hold that the circuit court correctly terminated George Ryan S.'s parental rights.

## II

■ Although the circuit court attempted to solve the custody dispute by making the maternal and paternal grandparents work together for the benefit of the child, the award of joint custody to the maternal and paternal grandparents was clearly an error. In *David M. v. Margaret M.,* 182 W.Va. 57, 385 S.E.2d 912, 927 (1989), we noted that "[j]oint custody works well when both parents live in the same neighborhood or at least in the same city, and so long as they can cooperate on child-rearing matters." Joint custody can work well when the parties have a cooperative spirit. Although a court can order joint custody, "it cannot order that the [grand]parents stop bickering, stop disparaging one another, or accommodate one another in child-care decisions." *Id.* In Syllabus Point 4, *Lowe v. Lowe,* 179 W.Va. 536, 370 S.E.2d 731 (1988), we held:

A cardinal criterion for an award of joint custody is the agreement of the parties and their mutual ability to co-operate in reaching shared decisions in matters affecting the child's welfare.

Syllabus Point 9, *David M., supra.*

■ Because joint custody requires agreement and cooperation by the parties, in Syllabus Point 8, *David M., supra,* we stated:

We do not authorize court-ordered joint custody over the objections of a primary caretaker parent although parents may agree to such an arrangement.

■ In the present case, the circuit court clearly erred in ordering joint custody over the objections of the maternal grandparents. The relationship among the grandparents was so scarred by the tragedy that neither maternal nor paternal grandparents were able to visit with the child in the other grandparents' house.

The paramount and controlling factor in all custody matters is the child's welfare. *David M., supra* 182 W.Va. at 61, 385 S.E.2d at 916; *J.B. v. A.B.,* 161 W.Va. 332, 335–36, 242 S.E.2d 248, 251 (1978); *Funkhouser v. Funkhouser,* 158 W.Va. 964, 969, 216 S.E.2d 570, 573 (1975); *Boos v. Boos,* 93 W.Va. 727, 117 S.E. 616 (1923): *Dawson v. Dawson,* 57 W.Va. 520, 50 S.E. 613 (1905). We have long held that "all parental rights in child custody matters are subordinate to the interests of the innocent child." *David M., supra* 182 W.Va. at 61, 385 S.E.2d at 916. In determining the custody of the child, the circuit court should determine what would be in his best interest.

■ The record of the present case does not dictate a clear or easy solution to this custody dispute. No question of fitness to raise the child was raised by either set of

---

**4.** George Ryan S. also argues that the proceeding terminating his parental rights was procedurally flawed because he was not physically present. We noted that although George Ryan S. was not present, his rights were protected at the hearing by a guardian ad litem. In addition, most of the evidence concerning George Ryan S.'s parental fitness came from his criminal conviction that was judicially noticed.

grandparents. Although the paternal grandparents became the child's primary caretakers after George Ryan S.'s incarceration, there are factors that indicate they should be denied custody. The record indicates that the circuit court identified the following factors for his initial grant of custody to the maternal grandparents: (1) the child would be removed from "the influence of an abusing, murdering parent," and (2) the paternal grandparents' "deliberate ..., wilful ... and active ..." interference with the maternal grandparents' visitation.

However given the passage of time and the joint custody arrangement, we are unable to determine from the record the placement that would best serve the interests of this very young child.

Therefore, we remand this case to ascertain proper custody considering the best interests of the child based on current considerations. On remand the circuit court shall appoint a guardian ad litem for the child and a hearing on the matter shall be held within sixty days. However, we would point out that if both sets of grandparents would prefer to avoid an all or nothing roll of the dice in the circuit court, it is still not too late to agree to some equitable and workable arrangement for joint custody. Indeed, joint custody is entirely acceptable whenever it is agreed to by the parties.

Accordingly, for the reasons set forth above, the judgment of the Circuit Court of Mingo County with respect to the termination of parental rights is affirmed, but with respect to the award of custody is reversed, and this case is remanded with directions to hold a hearing within sixty days to ascertain proper custody consistent with this opinion.

Affirmed in part; Reversed in part; and Remanded with directions.